# EXHIBIT C

7ANFMELC

BY DIRECTION OF THE COURT
Transcript furnished pursuant to
CJA not to be made available to
non-CJA counsel for any purpose
during or after trial and
not to be reproduced.

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
4                  v.                        07 CR 907

5  JOHN MELICHAREK, et al,

6                Defendants.
   ------------------------------x

7                                      New York, N.Y.
                                       October 23, 2007
8                                      2:30 p.m.

9  Before:

10               HON. SHIRA A. SCHEINDLIN,

11                                       District Judge

12                       APPEARANCES

13 MICHAEL J. GARCIA
        United States Attorney for the
14      Southern District of New York
   BENJAMIN GRUENSTEIN
15      Assistant United States Attorney

16 PAUL J. McALLISTER
        Attorney for Defendant Nicosia

17 JOHN N. MITCHELL
        Attorney for Defendant Gjelaj
18

19 STEVEN R. KARTAGENER
        Attorney for Defendant Celaj

20 JOHN MARINGOLO
        Attorney for Defendant Melacharek
21

22 SHERYL REICH
   GERALD LEFCOURT
23      Attorney for Defendant Pipolo

24 ALAN NELSON
        Attorney for Defendant Iuni

25 Also present:  John Laraia, Special Agent

7ANFMELC

1    Mr. Melicharek faces.  Also, Mr. Melicharek is charged in all

2    four crimes that are alleged in this indictment.  Mr. Pipolo is

3    charged in one.

4             I would like the opportunity to go through and

5    describe the crimes to your Honor, because I think a

6    description of that would demonstrate this defendant's danger

7    to the community.

8             THE COURT:  Well, of course, your adversary in the

9    brief put in a very interesting paragraph where they charted

10   out all the cases, the recent cases in the organized crime area

11   where judges, of course, nonetheless granted bail with things

12   like murder charges and other violent charges, and you saw the

13   list just as I saw the list; the alleged boss of the Genovese

14   family, the alleged consigliere of the Bonano family, the

15   alleged Genovese acting underboss, soldiers, etc., etc.  You

16   saw pages 6 and 7 was certainly a dramatic list of people who

17   have been admitted to bail.

18            MR. GRUENSTEIN:  That's correct, your Honor.  I'm

19   familiar with some of those cases, and, I mean, there are cases

20   on both sides.

21            THE COURT:  Of course.

22            MR. GRUENSTEIN:  And I think it's hard to go through

23   with a small tidbit as to what someone is charged with --

24            THE COURT:  These aren't tidbits.  These are no

25   people, anybody who reads the newspaper recognizes these names,

7ANFMELC

1    as you know.

2              MR. GRUENSTEIN:  As far as what they're charged with,

3    what the proof is against them.

4              THE COURT:  I can't talk about the proof, I can only

5    talk about the charges.  These were charges, as you know, of

6    murder and kidnapping and murder and drug distribution and the

7    rest of it.  There's no doubt about it.  I recall a good number

8    of these cases, which I would think you do, too.

9              MR. GRUENSTEIN:  I certainly know some of them, your

10   Honor.

11             THE COURT:  Right.

12             MR. GRUENSTEIN:  And I know there are judges in this

13   district who have repeatedly said that someone's, the fact that

14   someone is a made member of an organized crime family is a

15   strong -- is strong evidence that they pose a danger to the

16   community.  Because being in an organized crime family, they've

17   dedicated themselves to committing, to being part of a life of

18   crime.

19             Now, Mr. Melicharek, who is not Italian, is not a made

20   member of the Genovese crime family, but it's our information,

21   and we'll present this at trial, that he's a very high-ranking

22   associate, as high ranking as any non-Italian associate can be.

23   He's very close with Angelo Prisco, who is a captain in the

24   Genovese crime family.  We have recorded conversations about

25   discussions of Mr. Melicharek kicking money up to Angelo

7ANFMELC

1   Prisco.   These crimes, the money that came from these crimes

2   went directly to Angelo Prisco.

3          I do want to talk about the charges here and the facts

4   of those cases, because this is a 924(c) case.  There is a

5   presumption here, contrary to what Mr. Maringolo says, there is

6   a presumption there are no conditions and that's a presumption

7   set by Section 3142.  Now, of course, the Court has to consider

8   it, but I think our starting point is there are no conditions.

9   Now, if Mr. Maringolo can rebut the presumption --

10         THE COURT:  He didn't even think there was one.

11         MR. MARINGOLO:  To us there isn't.

12         THE COURT:  What do you mean to us?  The law is the

13   law.

14         MR. MARINGOLO:  Your Honor, he's presumed innocent as

15   he sits here.

16         THE COURT:  No, no, no.  That's not what presumption

17   is, you know that.  There are certain charges that create a

18   presumption; that is not a condition of bail.  There is a

19   presumption in this case.

20         MR. MARINGOLO:  In defense to that, your Honor, the

21   FBI has made numerous visits to Mr. Melicharek over the last

22   two and a half years.  These Hobbs Act robberies are from

23   September 28, 2003 and October 19, 2003, some four years ago.

24   We're not here to try the case your Honor --

25         THE COURT:  I know that.  But the weight of the

7ANFMELC

1    evidence --

2           MR. MARINGOLO:  But the government should know --

3           THE COURT:  Excuse me.  I think when I'm speaking,

4    you're supposed to stop.  That's elementary.  Look, I think the

5    weight of the evidence is one of the things the Court should be

6    aware of in a bail application.

7           MR. MARINGOLO:  Yes, your Honor, but the government

8    should know that on September 28, 2003, at the time of this

9    Hobbs Act robbery with the supposed gun, Mr. Melicharek was at

10   his son's football game, and they should be aware of that.

11          In addition to that, your Honor, that cooperating

12   witness has been known to be around Mr. Melicharek's

13   neighborhood or area in New Jersey over the last year and a

14   half, of which the FBI have told Mr. Melicharek that he is

15   cooperating.  So obviously he's not concerned.  He's a pillar

16   in the community, and, Judge, when we decide on the standard

17   for the danger in the community, I think we should go to the

18   community and see what the community says about Mr. Melicharek,

19   and in this particular case, we have Clifford and Samantha

20   Rimberg, we've written two letters on behalf of Mr. Melicharek.

21   They describe him as a loving person who has helped them with

22   their house chores such as mopping up their basement and floor,

23   but most important, your Honor, the Rimbergs trust John with

24   their children and Samantha Rimberg states in pertinent part,

25   "He has played catch and cards with my children, as he has his

7ANFMELC

1   own, and he sits with my two-year-old and plays Thomas the

2   Train.  He's a kind, dependable, trustworthy friend to my

3   entire family," and these are individuals that Mr. Melicharek

4   has met later in life in 1998.  They're individuals that are in

5   the community.  His neighbors.  They trust him with their

6   two-year-old children.

7           In addition to that, both his sons, who are here, one

8   of who has autism, the reason why they moved to New Jersey was

9   to better the life, to have better education.  His other son

10  plays football, your Honor, and what does Mr. Melicharek do in

11  the community when his son's been playing football over the

12  last four years?  He goes to the games and he sells hot dogs

13  and hamburgers to the members of the community at the

14  concession stand.  He donates his time.  And although he's not

15  a businessman, your Honor, as the prosecutor has said, he's an

16  ironworker, and he's worked 1700 hours in 2006 and he's worked

17  over a thousand hours in 2007.

18          THE COURT:  Yes, I read all that in your papers.

19          MR. MARINGOLO:  So I submit to the Court that he is

20  not a danger to the community, and I know the Court has read

21  all the letters.

22          THE COURT:  No, I haven't, actually, because I was

23  away until last night, but I've been reading them, quickly, as

24  we've been talking.

25          MR. GRUENSTEIN:  Your Honor, if I could return to the

7ANFMELC

1   issue that your Honor posed to defense counsel.  This is a

2   presumption case, it's 3142(e).  As far as, I do want to get

3   back to the risk of flight --

4           THE COURT:  What is the 3142(e), what is that about --

5           MR. GRUENSTEIN:  That it's an offense charged under

6   924(c).

7           THE COURT:  I see.

8           MR. GRUENSTEIN:  He does have a bench warrant.  It's

9   on his rap sheet and that is from the '95 case.  So now we have

10  two things that are both confirmed in the pretrial services

11  report and his rap sheet that the defendant is now denying are

12  true.  This goes back to the two issues ---

13          THE COURT:  Yes, I remember at the end of the pretrial

14  services report when I asked about the bench warrant they said

15  that was a mistake.  I don't know --

16          MR. GRUENSTEIN:  But it is in the rap sheet.  In any

17  event, that's not the focus to our argument.  The focus of our

18  argument is danger to the community and risk of flight.

19          THE COURT:  I want to get back to risk of the

20  community.

21          MR. GRUENSTEIN:  I want to discount a lot of what

22  counsel has said about the nice things he's done in his

23  community.  We're not claiming that he's someone who doesn't do

24  kind things.  He has a family, he's a family man.  He's not

25  causing injury to two-year-olds.  I'm sure he plays catch with

1    two-year-olds.  But in the course of doing that, despite having

2    a loving family, despite having a nurturing community, he is

3    committing extremely violent crimes as part of the Genovese

4    crime family.  I'd like to go through those.

5           The first one is charged in counts one and two.  It's

6    a $50,000 extortion of a company owner in Manhattan.

7    Mr. Melicharek was the primary person involved in the

8    extortion.  He and other people, including Mr. Iuni, whose bail

9    application is next, went to this owner and demanded money that

10   was not due to them.  They went on a number of occasions to

11   make collections.  They made threats towards this business

12   owner, threats including, "Should I stab him?  Can I punch him?

13   We know where you live."  In addition, Mr. Melicharek, this

14   seems like maybe a small point, but it certainly scared the

15   business owner, took a pumpkin from in front of the business

16   owner and crushed it to demonstrate a threat, and discussion of

17   that is on tape, Mr. Iuni on tape reporting how Mr. Melicharek

18   did that.

19          The evidence on that count is strong.  We have

20   information from the victim.  We have cooperators who will

21   testify about it.  We have a consensual recording in which

22   Mr. Iuni himself discusses the extortion in very explicit

23   terms.  And we also have information that Mr. Melicharek of the

24   $50,000, there were five people involved, he received $10,000

25   and Mr. Iuni, who was beneath Mr. Melicharek in the food chain

7ANFMELC

1   organized crime kicked up $1,500 of his portion to

2   Mr. Melicharek.  That's the first charge.

3        So despite what Mr. Maringolo says about all the kind

4   acts he does in his community, this is certainly an egregious

5   act he committed in his community.

6        Now, September of 2003.  This is the robbery that

7   Mr. Maringolo said he was at his son's football game.  We don't

8   dispute he was at his son's football game.  He very well may

9   have been.  That's not necessarily the information that we

10  have, but the point is here that Mr. Melicharek was involved in

11  setting up the robbery.  He didn't actually commit the robbery.

12  He set up the robbery because he knew that the owner of the

13  residence was a business owner.  He knew that the owner of the

14  residence had engaged in several large cash transactions in the

15  last month, one of which was 100,000, the other of which was

16  50,000.  Mr. Melicharek knew that man and it was precisely

17  because he knew the man that he couldn't be at the robbery.  So

18  if he was at his football gave it doesn't undermine the proof

19  in that count.

20        Mr. Melicharek learned where the safe was in the

21  house, where the valuable coins were in the house and where the

22  guns were in the house.  He conducted surveillance.  He then

23  hired three people who were capable of committing violent acts,

24  three associates of organized crime, again, three Albanians who

25  did the job with Mr. Memoli.  The family was at home, they were

7ANFMELC

1    sleeping at the time.  These individuals who went into the

2    house, they tied up the victim and another person, they

3    handcuffed them, they used duct tape.  Mr. Memoli had a gun, he

4    pistol whipped one of the victims when the individual didn't

5    open the safe.  Eventually they took $80,000, they took

6    jewelry, they took guns and they took the coin collection.  The

7    guns were ultimately recovered from Mr. Memoli's residence and

8    that's why Mr. Memoli has been in custody for the last four

9    years approximately serving a fifteen-year sentence for the

10   guns that were recovered in his house.

11           Again, the case is strong.  We have recordings of

12   co-conspirators who were involved in this robbery discussing

13   the break-in.  We have the victims who are ready to testify.

14           Again, this is another egregious act towards the

15   community, because Mr. Melicharek knew this individual.  He

16   knew that this individual was wealthy, he knew he was a

17   business owner, and precisely for that reason, he targeted him

18   to steal his money.

19           Third, we have, this is counts three and four, as well

20   as the gun counts in count five.  We have October of 2003 a

21   robbery in Orange County.  Again, Mr. Melicharek knew of this

22   individual.  Who was a somewhat well-known individual.  He and

23   another co-conspirator thought, well, he's well known, he has a

24   cash business, he probably has cash in the house.  So they

25   targeted his house to rob him.  This was the robbery where

7ANFMELC

1    Mr. Pipolo provided the guns.  Mr. Melicharek was the one who

2    pulled the crew together, including the three Albanian men,

3    including Mr. Celaj, Mr. Gjelaj and another individual and

4    Mr. Melicharek's involvement again was that he was the driver.

5    He was not actually inside the house.

6            Again, the person in the house was tied up with duct

7    tape.  A fight broke out, and eventually the individuals left.

8            Again, the proof in this robbery is very strong.  We

9    have the victim who is ready to testify.  We have cooperating

10   witnesses.  We have cell site records showing various

11   co-conspirators in the area at the time of the robbery.

12           Again, another instance where Mr. Melicharek targeted

13   a member of the community only for the reason that that person

14   was wealthy, to take that person's money.  Fourth, again, very

15   strong count.  This is the count only in which Mr. Melicharek

16   was charged.  This is an undercover sting where a cooperating

17   witness told Melicharek about stolen goods that he had, a coin

18   collection that was worth approximately $17,000.

19   Mr. Melicharek, who was interested in engaging in any criminal

20   activity that was presented to him, he was part of the

21   conspiracy to fence, to sell this stolen property and he did.

22   Again, it's a stong, a very strong count.  We have the

23   cooperating witness, and these conversations are all recorded.

24   There's really, there's not much to that count that's left to

25   the imagination.

7ANFMELC

1          So all of these charges are strong, and the strength

2    of the evidence is of course one factor to be considered in

3    demonstrating that the government has reinforced its

4    presumption which we do have the presumption in this case.    The

5    counts, the strength is relevant because it goes to risk of

6    flight that Mr. Melicharek, if he goes to trial, of course, I

7    can't predict the future, but based on this proffer of

8    evidence, he very likely will be convicted of all the counts,

9    and the strength of evidence is important, because it shows

10    that Mr. Melicharek was involved in basically any crime that

11    presented itself to him.

12          I want to address the issue that this was 2003 or

13    2004.    The government -- I don't want to speak too broadly for

14    the government, but at least my office and the agents that I'm

15    working with, I think it seems fair to say we've not been

16    investigating Rocky Melicharek, that's how he's known, John

17    Melicharek, for the last five years.    What we did do, we have

18    cooperating witnesses who provided the information, we had some

19    investigation but the cooperators were then pulled out because

20    they were made into cooperators.    They don't know what

21    Mr. Melicharek has been doing over the last four years, but if

22    his rap sheet which shows he's been committing crimes since

23    1990, which includes, there was a gun possession charge in

24    1990, there are two gambling charges in '95, there are these

25    charges from 2003-2004, if those are any indication, we

7ANFMELC

1    certainly believe that the absence of evidence that he's been

2    committing crimes is certainly not, in the last three years, is

3    not telling; it's just simply a matter of we haven't been

4    investigating him in that period and our cooperators who were

5    providing information were no longer part of the organized

6    crime family during that period once they were taken out of the

7    family.

8        So for all of these reasons, we do think that we met

9    our presumption.  There's nothing in Mr. Maringolo's papers, as

10   far as that he's a good family man and the like, we don't

11   dispute that, but we also don't think that that undermines the

12   presumption.  I do think while I do understand that

13   Mr. Maringolo has cited several, a number of cases where

14   organized crime figures have been let out on bail, there are as

15   many on the other side, and they're all done on a case-by-case

16   basis, and all done for whatever reasons that they're done.

17       THE COURT:  My only point in bringing those to your

18   attention, although you could have missed them in the brief, is

19   that people charged with very serious crimes, very dangerous

20   behavior, very violent behavior, nonetheless were admitted to

21   bail.  I suppose if the Court felt that the conditions of bail

22   were adequate to insure their appearance at trial, which is all

23   that pretrial detention is about.  It's certainly not advanced

24   punishment, so --

25       MR. GRUENSTEIN:  No, your Honor.