# EXHIBIT D

```
     7CCVMELC              Bail Hearing
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              07 CR 00907 (SAS)

5  JOHN MELICHAREK,

6          Defendant.

7  ------------------------------x

8                                          New York, N.Y.
                                           December 12, 2007
9                                          3:30 p.m.

10
   Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                           District Judge
13

14                      APPEARANCES

15 MICHAEL J. GARCIA
        United States Attorney for the
16      Southern District of New York
   ELIE HONIG
17 BENJAMIN GRUENSTEIN
        Assistant United States Attorneys
18
   JOHN MERINGOLO
19      -AND-
   BARRY LEVIN
20      Attorneys for Defendant

21
   ALSO PRESENT:   JOHN LaRAIA, FBI
22                 ANGIE GRIMWOOD, Paralegal

23

24

25

7CCVMELC                Bail Hearing

1           MR. LEVIN:  Correct.
2           THE COURT:  If I counted it right, it's 11 cosigners.
3  So you're talking about a large bond to be secured by 1.2
4  million dollars in equity and 11 cosigners.
5           MR. LEVIN:  Yes, your Honor.
6           THE COURT:  Sounds substantial.  All right.
7  Mr. Honig.
8           MR. HONIG:  Judge, a couple of points.  Can I use the
9  mike?
10          THE COURT:  Sure.
11          MR. HONIG:  First of all, the first appeal of the bail
12 there was a significant package offered, as well.
13          THE COURT:  Not as significant as this.
14          MR. HONIG:  No.  This is an incremental increase.
15 Last time the offer was $850,000 worth of home equity; now it's
16 up to 1.2 million dollars.  Last time it was three homes, now
17 it's four homes.  Last time it was four cosigners, it's still
18 four cosigners.
19          THE COURT:  So it's 11.
20          MR. HONIG:  Well, if you count the owners of the
21 homes.
22          THE COURT:  I do.
23          MR. HONIG:  The numbers of people are the same, with
24 the exception of one home has been added.
25          THE COURT:  Which is the added home?

7CCVMELC                    Bail Hearing

1        MR. HONIG:  I believe it's the neighbors'.
2        MR. LEVIN:  It's two homes that have been added, your
3   Honor.
4        THE COURT:  The two are?
5        MR. LEVIN:  The neighbor -- I'm sorry for not
6   standing.  The neighbors were not in your initial bail package,
7   and the doctor, Mr. Melicharek's sister, was not in the initial
8   bail package.
9        THE COURT:  The doctors.
10       MR. LEVIN:  The doctors, correct.
11       THE COURT:  Right.  So there's two more homes and four
12  more signers.
13       MR. HONIG:  That's what's changed on the defendant's
14  end, Judge.  We've already invoked risk of flight, as well as
15  danger.  And the size of the bail package doesn't address the
16  danger issue.
17       THE COURT:  I don't recall though.  And I need it all
18  reviewed.  I don't remember this case.
19       MR. HONIG:  Sure, I can summarize it quickly.  But
20  danger is really at the heart of the argument here.  And I'll
21  address that.
22       THE COURT:  And I don't remember it at all, so we have
23  to start all over again.
24       MR. HONIG:  Sure.  Mr. Melicharek is charged in all
25  eight counts of this indictment.

1        THE COURT:  I don't even know what he is charged with.
2        MR. HONIG:  I'll run through it.
3        THE COURT:  Thank you.
4        MR. HONIG:  Counts One and Two are extortion and
5   extortion conspiracy, same conduct.  Mr. Melicharek and others
6   essentially did an old-fashioned shakedown, $50,000 from a
7   contractor, including threats of violence, threats of physical
8   harm, threats of we-know-where-you-live, we-know-who-your-
9   family-is.  Mr. Melicharek made those threats directly.
10       The evidence on that includes testimony from the
11  victim.  There's a recorded statement by one of the other
12  people who was participating in this shakedown with
13  Mr. Melicharek.  And there are at least two cooperators lined
14  up to testify about it.
15       In other words, there's a recorded statement by
16  Mr. Iuni who's charged with this with Mr. Melicharek,
17  explaining how they did it and how they divvied up the money
18  after.  That's Counts One and Two.  That's the first criminal
19  act.
20       There are then two separate home invasions, Hobbs Act
21  robberies, with 924(c)s attached to each where Mr. Melicharek
22  and others organized and did, in fact, break into private
23  residences of business people involved in interstate commerce.
24  The first one was a break into a home in Morris County, New
25  Jersey.  Mr. Melicharek helped engineer it; was not physically

7CCVMELC                  Bail Hearing

1  present, but was one of the arrangers of it, was not physically
2  present because he knew the victim personally.  And more
3  importantly, the victim knew him personally.
4          The people who Mr. Melicharek pulled together to do
5  that robbery broke into the home, tied up the victim; it was
6  two women and a four or five-year-old child inside who were
7  awakened by this.  They pistol-whipped the victim and made off
8  with a significant amount of cash, jewelry, deeds, and valuable
9  coins that they thereafter fenced.  That's the first break-in
10 in Morris County.
11         About a month later, there was another break-in in
12 Orange County.  And again, Mr. Melicharek was one of the
13 organizers of that.  Mr. Melicharek was physically present at
14 this second one.  He drove the car full of the break-in team to
15 the site, and then waited for them outside in the car.  And
16 it's a similar pattern.  Again, the break-in team broke into
17 the home, there was an individual there, an older gentleman who
18 was tied up, physically beaten.  This time they didn't succeed
19 in finding any money, but they missed it, they realized
20 afterwards that they missed the cash.
21         Those are the second and third acts.
22         THE COURT:  These weren't randomly-selected victims?
23         MR. HONIG:  Oh, no.  The first one was targeted
24 because he had done business with one of Mr. Melicharek's
25 friends and associates.  He was involved in a scrap metal

7CCVMELC                     Bail Hearing

1    business.  They knew that he had just received a large amount
2    of cash.  They scoped out his home, knew exactly where his safe
3    was that they pistol-whipped the guy to get him to open.
4         And the second person is a minor celebrity, the second
5    target.  Man by the name -- well, the home was owned by, I
6    believe, the girlfriend, girlfriend of a man named Paul Teutul,
7    who's known -- there's a relatively popular cable TV show
8    called *Orange County Choppers*.  It's about Mr. Teutul's
9    motorcycle shop; it's got a following.  But he's known, he's a
10   well-known public figure.  That's why they targeted him,
11   because they believe -- they had an inside tip that he had a
12   significant amount of cash in his home from his business, from
13   his motorcycle business.  That's why he was targeted.
14        So they weren't random, they were targeted.  And I
15   think that's relevant here to the bail issue.  Obviously when
16   people are willing to sign for you, that means something; but
17   here, you know, the whole M.O. here is get close to these
18   people, people who trusted him, and turn on them and break into
19   their homes.  I'm not suggesting Mr. Melicharek is going to do
20   that here, but it takes away a little bit from the notion that
21   he feels a real obligation to people who are willing to get
22   close to him and trust him with things.
23        The last count against Mr. Melicharek is the FBI did a
24   sting involving fencing of gold coins, Krugerrands, that
25   Mr. Melicharek did basically -- he took the coins and fenced

7CCVMELC                    Bail Hearing

1    them, not a huge amount, worth about $17,000, but that's all on
2    tape and pretty neatly wrapped up.
3            The evidence -- I don't want to go too much into it,
4    but the evidence as whole includes recordings of
5    Mr. Melicharek, recordings of his co-conspirators talking about
6    these robberies, the break-ins, testimony from at least two,
7    possibly more, cooperators, victim testimony from the victim of
8    the extortion, as well as the people who were tied up and
9    beaten in their homes.
10           THE COURT:  Well, of course, they shouldn't have any
11   evidence against Mr. Melicharek.
12           MR. HONIG:  They won't be doing IDs.
13           THE COURT:  Right.
14           MR. HONIG:  Although they can provide relevant
15   evidence as to motive and opportunity.
16           THE COURT:  Right.
17           MR. HONIG:  But no, that's correct.  Although the
18   extortion victim will certainly know exactly who he is.
19           THE COURT:  Right.
20           MR. HONIG:  One of the issues that the Court had
21   raised last time is, well, how recent is any of this?  The
22   break-ins were in late '03, late '03; the extortion was in late
23   '04, going into '05.  So to the same extent that the defendants
24   are now offering a little bit more on the bail package, I'd
25   like to offer a little bit more about more recent things that

7CCVMELC				Bail Hearing

1    Mr. Melicharek has been involved in.
2              Mr. Melicharek has -- he has a long criminal history,
3    I'm not saying it's the most serious one, but he had a 1991
4    felony for weapons possession, and then misdemeanors, two in
5    '95 and one in 2000. So he's not a newcomer to crime, he's not
6    the most -- he doesn't have the longest rap sheet.
7              THE COURT: What were these misdemeanors for? The
8    presentence report -- I'm sorry, the pretrial report says
9    criminal possession of a weapon, that was the one felony in one
10   1991, which is a long time ago, but I don't know what the
11   misdemeanor is for.
12             MR. HONIG: He has a 1995 gambling misdemeanor and a
13   2000 DUI.
14             THE COURT: And one other? You said three.
15             MR. HONIG: I may have misspoke.
16             THE COURT: No, it says three in the report, three
17   misdemeanors; one DUI, one gambling.
18             MR. LEVIN: Your Honor, the gambling are interrelated;
19   they were two separate counts, so it's really one charge. And
20   that's back in '90.
21             MR. HONIG: Judge, let me just briefly give the Court
22   a little more information on some of the more recent stuff.
23   And again, these break-ins are '03, the extortion is '04 into
24   '05, non-ancient history. And it's all mob-connected. This is
25   all a Genovese --

1            THE COURT:  It's all what?

2            MR. HONIG:  Mob-connected.  This is all Genovese

3    family activity, and I'll go into a little more detail on that.

4            First of all, we have -- there's a recording that the

5    defense has had that we produced back with the original

6    discovery, I believe, from October 27th of 2005, where

7    Mr. Melicharek is discussing with the cooperating witness,

8    who's wearing a body wire, his plans to do another violent

9    break-in of another business associate of his.  It's about a

10   two-minute clip.  I'd like to play it for the Court, because I

11   think it gives an important sense of what this was all about.

12   And this is even more recent than the charged crimes.

13           THE COURT:  What year you said?

14           MR. HONIG:  October '05.

15           (Audiotape played)

16           MR. HONIG:  Before I go any further, there's two

17   voices on the tape.  The, I guess, higher-pitched one that's

18   more clearly heard on the tape, that's louder on the tape, is

19   the cooperating witness.  The lower-pitched one is

20   Mr. Melicharek.  I think it will be clear.

21           (Audiotape played)

22           MR. HONIG:  Judge, I mean I think that largely speaks

23   for itself.  They are discussing a plan to break in to the

24   business, walk into the business of a person in the garment

25   district in Manhattan, meet him; while dressed as cops, rob him

7CCVMELC                    Bail Hearing

1  of cash. And you heard the reference to weed. And there's
2  some conversation that precedes that. But that's even more
3  recent than the charged activity. And I think that gives you a
4  sense of what the operation was here.
5           In addition, there are four calls that we've also
6  produced -- or not calls, body wires, that we've produced to
7  the defense from January to March of 2006. And in those calls,
8  Mr. Melicharek talks all about his mob connections, and I'll
9  talk about some of those in a second. He repeatedly is
10 discussing who that they know might cooperate with law
11 enforcement, and ways to make sure that people don't rat.
12          Mr. Melicharek talks about the fact that he had -- the
13 way to do it is to give the person a lawyer who will let him,
14 Melicharek, know if the client tries to cooperate. Melicharek
15 said he'd done this once; he'd gotten the person a lawyer who
16 would then tell Melicharek if his client ratted. That's
17 obviously obstruction, and it shows you there's a certain level
18 of resources here, there's a level of sophistication and
19 understanding of how to interfere with these processes and how
20 to influence the process.
21          There's also recordings from '06 which they have
22 wherein which Mr. Melicharek's discussing various ongoing
23 crimes. He's talking about helping to arrange a loan shark
24 loan from Joey Leo, who's an associate of the Genovese family
25 and the nephew of the boss of the family, Danny Leo. Kicking

7CCVMELC                    Bail Hearing

1    up money from a Genovese associate to his capo, a man named
2    Angelo Prisco, who's Mr. Melicharek's capo in the Genovese
3    family. Mr. Melicharek talks about splitting proceeds from
4    other activities of his with Mr. Prisco. And he says at one
5    point that he would "do anything" for his capo, for Angelo
6    Prisco. And that's where his priorities lay and always have.
7         You're talking about a person who's charged with just
8    violent -- straight-up violent, really vicious crimes,
9    committed them basically unstopped from '03 until the
10   recordings take us through '06. He's facing an enormous amount
11   of time, he's facing, if convicted on both 924(c) counts, 32
12   years mandatory minimum consecutive, one of them is a
13   brandishing charge, so it's seven years. And then the other
14   one is 25 on top of it.
15        The evidence, I don't want to get too into it, but
16   there's tapes to back up what cooperators say, there's victim
17   testimony, there's crime scene testimony. He's a danger. And
18   I don't think any bail package would address that.
19        MR. LEVIN:  Your Honor, if I may respond.
20        THE COURT:  Yeah, just one second. All right.
21   Mr. Levin.
22        MR. LEVIN:  Your Honor, I'm not going to go through a
23   litany of the factors under 3142, I'm sure the Court is
24   familiar with it. But certainly the nature and circumstances
25   of the crime are a factor the Court has to consider.

```
            7CCVMELC              Bail Hearing
```

1          The tape that was just played I had not heard before.
2    To the extent I have listened --
3          THE COURT: Has it been turned over to you?
4          MR. LEVIN: No, it hasn't. Well, I'm not going to
5    make accusations against the government. As your Honor knows,
6    I'm new to the case, but what was turned over to me was April
7    20th, October 23rd, October 25th, and October 27th. Those
8    particular tapes are not that tape that I just listened to.
9    And I have the transcripts of the tapes that go with that.
10         But be that as it may, I'm not here to dispute whether
11   that tape is an accurate rendition or not. What I'm here to
12   say to the Court is that, yes, the nature and circumstances of
13   the crime certainly is one factor, a very important factor.
14   But also one has to look to the strength of the evidence,
15   background of the defendant, and whether he is a threat to
16   others.
17         And in regard to that, this Court should be aware of
18   the fact that Mr. Melicharek is an ironworker. In the last two
19   years prior to his incarceration, he had worked 1700 hours; and
20   the year before that, 1,000 hours. That pretty much is
21   full-time.
22         He's a family man. He has two kids. His wife is a
23   special education teacher. She's here today.
24         And in regard to the most important issue, whether he
25   is a danger, what the government did not tell this Court is the

| | |
|---|---|
| 7CCVMELC | Bail Hearing |

1   primary cooperating witness, a Mr. Cobb, was disclosed to
2   Mr. Melicharek as early as the fall of 2004. Mr. Cobb was the
3   football coach for Mr. Melicharek's son, and he was a member of
4   the Glen Rock community.
5       Mr. Melicharek, after being informed by the FBI that
6   Mr. Cobb was going to testify against him, continued to see
7   Mr. Cobb on a daily basis in the community. He saw him at
8   football games, he saw them at their children's prom as
9   recently as July of '07.
10      And Mr. Melicharek knew he was going to be arrested,
11  and he minded his own business. He did not threaten anyone,
12  and he went about his business, and he stayed away from
13  Mr. Cobb, as well as the other cooperators in this case. He
14  has not threatened anyone. He has not attempted to get in
15  touch with anyone. And remember, as the government points out,
16  this goes back three years, four years in some cases.
17      So Mr. Melicharek has not threatened anyone. And I
18  don't believe he's a danger. And I think that is a material
19  factor under subsection G.
20      I think that the Court should also be aware that
21  Mr. Melicharek did not -- the charged Hobbs Act robberies in
22  the indictment, Mr. Melicharek was not the originator, the
23  organizer, or even present. They did acknowledge he wasn't
24  present, but it's the cooperators that created these crimes.
25      On April 20th, 2004, Mr. Bisconti and Mr. Cobb are